**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

Richmond Division

JAN - 5 2011

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

... to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

|  |  |
|---|---|
| ) | **CRIMINAL NO. 3:11CR** *014* |
| ) |  |
| ) | **Count 1** |
| ) | **Wire & Mail Fraud Conspiracy** |
| **UNITED STATES OF AMERICA** ) | **(18 U.S.C. § 1349)** |
| ) |  |
| **v.** ) | **Counts 2 – 4** |
| ) | **Wire Fraud** |
| **PROVIDENT CAPITAL INDEMNITY, LTD.,** ) | **(18 U.S.C. §§ 1343 and 2)** |
| ) |  |
| **MINOR VARGAS CALVO, and** ) | **Count 5 – 7** |
| ) | **Mail Fraud** |
| **JORGE LUIS CASTILLO,** ) | **(18 U.S.C. §§ 1341 and 2)** |
| ) |  |
| **Defendants.** ) | **UNDER SEAL PURSUANT TO** |
| ) | **FED. R. CRIM. P. 6(e)(4)** |

January 2011 Term – At Richmond

## INDICTMENT

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

### GENERAL ALLEGATIONS

#### The Conspirators

1.     PROVIDENT CAPITAL INDEMNITY, LTD, ("PCI") was an insurance and reinsurance company registered in the Commonwealth of Dominica, with business operations located in the Republic of Costa Rica.

3

2.     MINOR VARGAS CALVO ("VARGAS") was the president and majority owner of PCI. VARGAS is a Costa Rican citizen and lives in Costa Rica.

3.     JORGE LUIS CASTILLO ("CASTILLO") was the purported outside auditor for PCI. CASTILLO held certifications as a certified public accountant in Costa Rica and New Jersey, but his New Jersey certification was suspended in or about 2010. CASTILLO was born in Costa Rica but is now a naturalized United States citizen, residing in New Jersey.

### Background of Life Settlements

4.     A life settlement is an investment in which an investor purchases a life insurance policy on an insured individual. This individual is typically elderly or terminally ill, and sells his life insurance policy for a cash payment, which is a percentage of the life insurance policy's face value or death benefit. The "face value" or "death benefit" is the amount of money paid by the insurance company when the insured dies. Life settlement companies typically purchase life insurance policies from insured individuals or through life settlement wholesalers.

5.     Once the insured sells an insurance policy, the insured is no longer responsible for paying the policy's premiums. To keep the policy in force, the life settlement company must ensure any premiums are paid. All premiums due prior to the death of the insured must be paid, in full and on a timely basis, to prevent additional cost or lapse.

6.     A policy is said to have "matured" when the insured individual dies and the insurance company is required to pay the death benefit to the designated parties, that is, the "beneficiaries." But if an insurance policy lapses for any reason, such as failure to pay premiums, the policy's death benefit and any investment dependent on that benefit may be lost.

2

7.     Life settlement companies often sell fractionalized interests in life insurance policies as investments to individual investors. In such sales, investors are buying the right to receive a portion of the death benefit when the insured dies. The sale of fractional interests allows investors to invest smaller amounts of money, because each investor does not have to pay for the whole policy.

8.     Investors who purchase life settlements only realize a profit if the total amount invested in the policy, including the purchase price and any additional premium costs, is less than the amount of the death benefit. A life settlement is not profitable if the expenses of acquiring and maintaining the policy (including the amount of premiums that are paid) are more than the amount of the death benefit paid when the insured dies. Typically, the longer an insured lives, the more expensive it is to maintain a life settlement.

9.     The period of time that the insured is predicted to live is called the "life expectancy." In the purchase and sale of life settlements, the assessment of an insured's life expectancy is used to determine, among other things: (a) how much money needs to be set aside to pay future premiums; (b) when the investor can expect to receive a payout on his or her investment; and, (c) the amount of profit the investor can expect to receive.

10.     The risk to the life settlement investor of the insured living past the calculated life expectancy—and thereby reducing the expected return on the investment—is often referred to in the industry as "maturity risk" or "longevity risk."

11.     Instead of selling fractionalized or whole interests in specific life settlements to investors, some life settlement companies sell securities to investors that are securitized (*i.e.*, backed) by an underlying pool of life settlements. For example, a life settlement company may

3

sell an investment with a specified maturity date to an investor that promises a minimum return on investment and that the investment is backed by a pool of life settlements. The maturity date of the investment typically corresponds to the life expectancies of the underlying pool of life settlements.

### PCI's Financial Guarantee Bonds

12.    Beginning in or about 2004, PCI began selling what it termed as "financial guarantee bonds" or "life expectancy guarantee bonds." The typical purchasers of PCI's financial guarantee bonds were life settlement investment companies that sold life settlements or securities backed by life settlements to investors. PCI's financial guarantee bonds were marketed to its clients as a method to alleviate the maturity risk of insureds living beyond their life expectancies. PCI promised purchasers of PCI's financial guarantee bonds that in the event the insured lived beyond his or her life expectancy, PCI would pay the full face amount of the life insurance policy to the purchaser. PCI then would assume ownership of the life insurance policy, be responsible for any future premium payments necessary to keep the policy in force, and receive the death benefit upon the death of the insured.

13.    Purchasers of PCI's financial guarantee bonds generally were required to pay up-front payments, which PCI characterized as "premium" payments, to PCI before PCI would issue the financial guarantee bonds. These payments typically ranged from 6% to 11% of the face amount of the particular underlying life settlement for which the financial guarantee bond was issued.

14.    PCI's financial guarantee bonds were an important marketing tool for life settlement investment companies' sales of their investment offerings to investors. These

4

companies typically explained to their investors that the financial guarantee bonds made certain

that investors would receive their expected return on investment irrespective of whether the

insured on the underlying life settlement lived beyond his or her life expectancy.

### PCI's Marketing of Financial Guarantee Bonds

15.     In order to convince potential purchasers of financial guarantee bonds that PCI

could pay claims on its bonds, PCI claimed that it had entered into reinsurance contracts with

major reinsurance companies whereby the reinsurance companies would assume the majority of

the risk that PCI had insured via its financial guarantee bonds.

16.     In order to provide further assurances regarding its ability to pay claims, PCI often

distributed the company's purported audited financial statements to potential clients.  In addition,

PCI typically attached a letter from its purported independent auditor attesting that an audit,

performed in accordance with generally accepted auditing standards, had revealed no material

misstatements contained in the financial statements.  The financial statements PCI distributed

showed significant assets and relatively small liabilities.

17.     In addition to PCI's representations regarding reinsurance and its financial

statements, PCI also informed potential clients that PCI had the highest rating from Dun and

Bradstreet ("D&B"), a business information company that provides commercial reports on

companies, in order to further reassure clients about PCI's ability to pay claims.  D&B typically

requires audited financial statements, but does not independently confirm the accuracy of those

financial statements.

18.     On the basis of these representations about its ability to pay claims, PCI sold

hundreds of millions of dollars of financial guarantee bonds to clients around the world.

According to PCI's own records, from in or about 2004 through 2010, PCI sold approximately $670 million of financial guarantee bonds to life settlement investment companies located in various countries including, but not limited to, the United States, the Netherlands, Germany, and Canada. These life settlement investment companies, in turn, sold investment offerings backed by PCI's financial guarantee bonds to thousands of investors around the world.

## SCHEME AND ARTIFICE

19.     PCI, VARGAS, CASTILLO, and other conspirators made, and caused to be made, numerous material misrepresentations and omissions designed to mislead PCI's clients and potential clients regarding PCI's ability to pay claims when due on the financial guarantee bonds that PCI issued.

### Misrepresentations Regarding Reinsurance Contracts

20.     From in or about 2004 through the present, PCI, VARGAS, CASTILLO, and other conspirators told clients and potential clients that PCI had entered into reinsurance contracts with a "bouquet" of major "A-rated" reinsurers whereby the reinsurance companies assumed the majority of risk insured by PCI's financial guarantee bonds. The major reinsurance companies that the conspirators claimed had entered into reinsurance contracts with PCI included, but not limited to, Swiss Re, General Re, American International Group, Munich Re, and ING.

21.     When clients and potential clients asked VARGAS for verification of the reinsurance treaties, VARGAS told them that details of PCI's reinsurance protection could not be disclosed due to confidentiality provisions of PCI's agreements with the A-rated reinsurers. VARGAS further explained that should details of the reinsurance agreements be disclosed, PCI's

6

reinsurance costs would be much higher. VARGAS gave a similar explanation of PCI's

"inability" to share details of its reinsurance contracts during a secretly videotaped meeting

between VARGAS and state securities regulators in the United States in or about July of 2010.

22.     As PCI, VARGAS, and other conspirators well knew, however, PCI never

actually entered into reinsurance contracts, with Swiss Re, Gen Re, American International

Group, Munich Re, or ING.  In fact, in or about April of 2010, in response to foreign authorities'

requests for confirmation of PCI's reinsurance contracts VARGAS sent a series of emails to a

reinsurance broker in which VARGAS: (a) admitted that since 2004, PCI had told clients that

PCI had a "bouquet" of reinsurance contracts, with A-rated reinsurers; (b) explained that one of

PCI's important clients was being questioned by a financial regulator about PCI's reinsurance

contracts; (c) stated that this client was requesting official written confirmation regarding PCI's

reinsurance contracts to provide to the financial regulator; and, (d) asked how much such

reinsurance would actually cost.

23.     PCI, VARGAS, CASTILLO, and other conspirators knew that PCI's life

settlement investment company clients further disseminated these false representations to their

investors.

<u>Misrepresentations Regarding Audited Financial Statements</u>

24.     From in or about 2004 through the present, PCI, VARGAS, CASTILLO, and

other conspirators made numerous material misrepresentations and omissions regarding PCI's

purported independently audited financial statements.  During this time, CASTILLO provided

PCI and VARGAS with annual letters entitled "Independent Auditors Report."  In these letters,

CASTILLO claimed: (a) to have audited PCI's financial statements, which accompanied the

letters, pursuant to generally accepted auditing standards; (b) that the audit included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; and, (c) that the audit provided a reasonable basis for CASTILLO's opinion that PCI's financial statements fairly presented PCI's financial position in all material respects.

25.    As numerous emails between VARGAS and CASTILLO demonstrate, however, CASTILLO never performed an audit of PCI's financial statements and, in fact, CASTILLO personally created the very financial statements that he claimed to be independently auditing. Examples of these emails, which were written in Spanish (the quoted capitalizations appeared in the originals), include:

a.  On or about January 5, 2009, CASTILLO sent an email to VARGAS attaching a draft of PCI's 2008 financial statements and stating, "Please note the reduction in interest earned on the Income Statement. This is due, first of all, to the decrease we made to other assets last year, and I also thought it would also be best to lower the interest rate to something more credible and in line with the market: 5.15%. I thought a higher rate might lead to questions from third parties."

b.  On or about August 18, 2009, in response to a request from VARGAS to CASTILLO for information to provide to a PCI client, CASTILLO sent an email to VARGAS stating, "Today they will verify my license, but I am sure that soon circumstances will arise in which they demand a direct verification of PCI's assets. I am only thinking about the future, and I'm asking myself what we will do in that case. . . . Mr. Minor, you know full well that if they ask me for all my accounting certificates that confirm the PCI assets, etc., I don't have them, since what I have done is allow my name to be used as the CPA for customers who normally don't go through the formalities that these people want." On the same day, VARGAS sent a response email to CASTILLO stating, "If any problems arise and they ask us for confirmation of assets, we would have to think about a contingency plan where we could tell them, with your advice, that the company lost part of or a significant portion of its assets for some valid reason (payment or claims or partners exiting, for example)."

c.  On or about February 6, 2010, after CASTILLO's certified public accountant license was suspended indefinitely, CASTILLO wrote VARGAS an email stating,

8

"I consulted anonymously with a group of lawyers specialized in immigration and similar laws, regarding 'jurisdiction' in a case. The answer was very clear and simple: the United States feels it has jurisdiction over everything, especially if an American citizen has been affected. Therefore, they can even demand extradition or direct arrest (they cited the Noriega case in Panama, as an example). In my case, I am already here, but in yours, they could resort to something similar. . . . I have some ideas I'm organizing now to propose to you, which I believe might minimize the matter in some way. But we need to dedicate some time to avoid making mistakes in the strategy. As a first step, allow me to suggest you eliminate all my e-mails. Check the sent box too, because they remain stored there. Make a back-up and delete any information from the computer. If necessary, put the computer in any other place that is not your office. Likewise, take out all documents and deposit them in a safe place. I did the same in my apartment."

d.  On or about February 12, 2010, CASTILLO sent an email to VARGAS requesting PCI documents in order to attempt to justify his prior audit letters, stating, "You know I have acted a lot in good faith and have omitted basic procedures which, under other circumstances, I would have done differently. And since we want to do things right, let's do just that for the period of time we legally have to do them. . . . Would it be possible for you to send me photocopies of real documents that smell of money (in other words, [documents] that show a finalized transaction, of money collected, or money paid, etc.)? The more of these you can send me, the better. What I want to set up is a real accounting for each of those fiscal years, and determine what is missing to meet 100% of the figures, as pertaining to confirmations, etc. I know it won't be possible to justify 100% with real documents, BUT THIS IS AUDITING. I DON'T NEED TO JUSTIFY 100% TO ANYONE SINCE AUDITING IS BASED ON SELECTIVE PROOF. I will then set up the accounting to what we need, but will justify my work papers with the documents you send me, under the argument that is the result of selective proof. Do you understand?"

e.  On or about February 26, 2010, CASTILLO sent an email to VARGAS in which he asked VARGAS to send him various PCI records under the heading "NECESSARY DOCUMENTS FOR FISCAL PERIODS AS OF SEPT 30 2008 AND SEPT 30 2009." In the email, CASTILLO asked VARGAS "DO YOU HAVE ANY KIND OF ACCOUNTING SYSTEM? IF SO, PLEASE SEND ME AS MUCH INFORMATION AS POSSIBLE." VARGAS sent an email to CASTILLO the next day stating, "We don't have any accounting, so I'd appreciate it if you would organize the info in the best way possible with the data I sent you."

9

26.     Despite knowing that CASTILLO's annual audit report letters and the accompanying financial statements were fraudulent, PCI, VARGAS, CASTILLO, and other conspirators distributed those fraudulent documents to PCI's clients and potential clients in an effort to market PCI's financial guarantee bonds.

## Misrepresentations Regarding D&B

27.     From in or about 2004 through the present, PCI, VARGAS, CASTILLO, and other conspirators provided and caused to be provided CASTILLO's fraudulent annual "Independent Auditors Report" letters and the accompanying financial statements to D&B. The conspirators knew that D&B would rely on this information to compile its commercial reports and to issue its ratings of PCI. The conspirators further knew that D&B typically did not independently verify information provided by the companies for which it issued commercial reports.

28.     From in or about 2004 through the present, based on the purported independently audited financial statements provided by PCI, VARGAS, and other conspirators, D&B issued a "5A" rating of PCI's estimated financial strength. This rating denoted a company with a net worth of $50 million or more, but D&B calculated PCI's net worth by subtracting the relatively small liabilities from the significant assets reflected on PCI's fraudulent financial statements.

29.     From in or about 2004 through the present, PCI, VARGAS, and other conspirators made material misrepresentations and omissions regarding PCI's D&B rating in PCI's promotional materials. For example, in or about January of 2011, PCI's website stated:

> As a private fully recognized insurance company, PCI has chosen
> to use the rating services of Dunn [sic] and Bradstreet
> Internationally [sic]. PCI's strict underwriting guidelines is [sic]
> responsible for maintaining the highest rating attainable (5A) from

> D&B indicating successful customer satisfaction and the ability to
> maintain one of the insurance industry [sic] lowest loss ratios.

PCI, VARGAS, and other conspirators made similar claims in PCI's marketing brochures that were distributed to PCI's clients and potential clients. As the conspirators well knew, however, D&B's "5A" rating for PCI was: (a) simply a function of D&B's calculations of PCI's net worth, which were based entirely on the fraudulent financial statements provided by PCI; and (b) had nothing to do with PCI's customer satisfaction or loss ratio.

30. PCI's claims regarding D&B's rating of PCI also were designed to mislead PCI's clients and potential clients into believing that D&B had performed independent verification regarding PCI's ability to pay claims. As the conspirators well knew, however, D&B did not independently verify the information that PCI provided.

31. In or about April of 2010, PCI, VARGAS, and other conspirators took steps to ensure that D&B could not even attempt to independently verify the fraudulent financial information that they had provided to D&B. During that time, D&B became concerned that the long term asset figure stated in PCI's 2009 financial statements—which represented more than 80% of PCI's claimed total assets and directly affected PCI's "5A" rating—might be fraudulent and D&B requested information to independently verify that figure. In an email sent to D&B on or about April 11, 2010, one of the conspirators, with VARGAS's approval, responded to D&B's concerns by refusing to provide the requested information and attempting to explain the refusal by stating that PCI's board of directors prohibited PCI's management from sharing such sensitive and confidential information with third parties. In addition, the email falsely stated that "Long term assets is an account that has been audited during all of our years in business, with no

11

concern whatsoever in regards to its accuracy and liquidity.  PCI has been diligent in the proper

management of this account, in such a way to assure its readiness whenever necessary."

PCI's Failure to Pay Claims on Financial Guarantee Bonds

32.     Despite consistent representations by PCI, VARGAS, and other conspirators

regarding PCI's ability to pay claims on its financial guarantee bonds, when owners of PCI's

financial guarantee bonds made payment claims to PCI on those bonds, the conspirators engaged

in a pattern and practice of denying that PCI was obligated to make such payments.  As a basis

for their denials, the conspirators claimed that the premiums for the financial guarantee bonds in

question were not paid in their entirety or that the requisite information was not provided by the

clients to PCI.

33.     Given PCI's status as a Costa Rican-based company and the general lack of legal

recourse available to financial guarantee bond owners against PCI, the conspirators—typically

VARGAS—were often able to negotiate reduced or delayed payments on PCI's financial

guarantee bond obligations because bond owners had little alternative.  But even after promising

to make reduced or delayed payments to financial guarantee bond owners, PCI, VARGAS, and

other conspirators often failed to follow through on those promises.  For example, on or about

February 11, 2010, VARGAS entered into a settlement agreement, on behalf of PCI, with a

financial guarantee bond owner whereby PCI agreed to make 12 equal monthly payments totaling

$10 million beginning in June of 2010.  After making two of the required payments, PCI failed to

make any additional payments despite repeated demands to PCI and VARGAS by the financial

guarantee bond owner.  VARGAS repeatedly promised that PCI's payments were imminent and

12

attempted to explain PCI's failure to meet its obligations by claiming that international banking regulations were responsible for the delay. The promised payments never arrived.

## Use of the Wires and Mail During the Scheme

34.     As part of the scheme to defraud, PCI, VARGAS, CASTILLO, and other conspirators routinely transmitted and caused to be transmitted wire communications in interstate and foreign commerce to send PCI's marketing materials, audit report letters, financial statements, D&B reports, and financial guarantee bonds. Many of these interstate and foreign wire communications came to or from the Eastern District of Virginia.

35.     As part of the scheme to defraud, PCI, VARGAS, CASTILLO, and other conspirators routinely used and caused to be used the United States mail and private mail carriers to send PCI's marketing materials, audit report letters, financial statements, D&B reports, financial guarantee bonds, and correspondence regarding PCI's financial guarantee bonds. Some of these mailings came to or from the Eastern District of Virginia.

<u>COUNT ONE</u>

(Conspiracy to Commit Wire and Mail Fraud)

**THE CONSPIRACY**

36.     The allegations set forth in paragraphs 1 through 35 of this Indictment are realleged and incorporated as though set forth in full herein.

37.     From in or about 2004 through the present, within the Eastern District of Virginia and elsewhere, defendants

**PROVIDENT CAPITAL INDEMNITY, LTD.,**
**MINOR VARGAS CALVO, and**
**JORGE LUIS CASTILLO**

did unlawfully and knowingly combine, conspire, confederate, and agree with each other and others, both known and unknown, to commit an offense against the United States, to wit:

a.     Having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, knowingly transmitting and causing to be transmitted by means of wire communications in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343;

b.     Having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, knowingly: (a) placing and causing to be placed in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) depositing and

14

causing to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and, (c) causing to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

## MANNER AND MEANS

38.     For the purpose of executing the above described scheme, PCI, VARGAS, CASTILLO, and other conspirators made numerous material misrepresentations and omissions in order to induce potential clients to purchase financial guarantee bonds. These misrepresentations and omissions included, but were not limited to: (a) representations regarding PCI's purported reinsurance contracts with major reinsurers; (b) representations regarding PCI's purportedly audited financial statements; and, (c) representations regarding PCI's D&B rating.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS TWO THROUGH FOUR

(Wire Fraud)

39.     The allegations contained in paragraphs 1 through 35 of this Indictment are

realleged and incorporated as though set forth in full herein.

40.     On or about the respective dates shown below, each such date constituting a

separate count of this Indictment, within the Eastern District of Virginia and elsewhere,

defendants

**PROVIDENT CAPITAL INDEMNITY, LTD.,
MINOR VARGAS CALVO, and
JORGE LUIS CASTILLO**

and others, having devised and intending to devise the scheme and artifice to defraud described

above and to obtain money and property by means of material false and fraudulent pretenses,

representations, and promises, did knowingly transmit and cause to be transmitted by means of

wire communications in interstate and foreign commerce, any writings, signs, signals, pictures,

and sounds for the purpose of executing such scheme and artifice.

| Count | Date | Description |
|-------|------|-------------|
| 2 | 8/12/08 | Electronic mail sent from VARGAS's Hotmail account to B.G.—the president of a potential life settlement investment company client—in the Eastern District of Virginia, attached to which was a letter from CASTILLO in which CASTILLO stated, in part, "We certify that we have audited the Balance Sheet of Provident Capital Indemnity Limited as of September 30, 2007, and the Statements of Income, Retained Earnings and Cash Flows for the year then ended." |

| 3 | 9/10/08 | Electronic mail sent from VARGAS's Hotmail account to B.G. in the Eastern District of Virginia in which VARGAS stated "Yes, your statement is correct!" in response to an earlier email from B.G., in which B.G. informed VARGAS that B.G.'s investment fund would like to mention in its offering documents the "multiple A rated or better insurance and reinsurance companies" that secured their investments, but that B.G. wanted to confirm the accuracy of such a representation. |
| 4 | 10/20/08 | Electronic mail sent from VARGAS's Hotmail account to B.G. in the Eastern District of Virginia, attached to which was a copy of PCI's 2008 D&B report. |

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

17

## COUNTS FIVE THROUGH SEVEN

### (Mail Fraud)

41.    The allegations contained in paragraphs 1 through 35 of this Indictment are realleged and incorporated as though set forth in full herein.

42.    On or about the respective dates shown below, each such date constituting a separate count of this Indictment, within the Eastern District of Virginia and elsewhere, defendants

**PROVIDENT CAPITAL INDEMNITY, LTD.,**
**MINOR VARGAS CALVO, and**
**JORGE LUIS CASTILLO**

and others, having devised and intending to devise the scheme and artifice to defraud described above and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, did knowingly: (a) place and cause to be placed in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and, (c) cause to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, the following:

| Count | Date | Mailing |
|-------|------|---------|
| 5 | 6/21/06 | A package containing a letter—from life settlement investment company A&O in Houston, TX, to be delivered via Federal Express, to sales agent T.B. in Richmond, VA—stating that PCI would pay $10 million no later than May 1, 2010, on a particular life settlement investment. |

18

| 6 | 10/13/06 | A package containing a letter—from life settlement investment company A&O in Houston, TX, to be delivered via Federal Express, to sales agent T.B. in Richmond, VA—stating that PCI would pay $13.7 million no later than February 27, 2012, on a particular life settlement investment. |
| 7 | 11/17/06 | A package containing a letter—from life settlement investment company A&O in Houston, TX, to be delivered via Federal Express, to sales agent T.B. in Richmond, VA—stating that PCI would pay $6 million no later than February 17, 2013, on a particular life settlement investment. |

(All in violation of Title 18, United States Code, Sections 1341 and 2.)

19

## FORFEITURE ALLEGATION

43.     Pursuant to Federal Rule of Criminal Procedure 32.2, Defendants PROVIDENT

CAPITAL INDEMNITY, LTD., MINOR VARGAS CALVO, and JORGE LUIS CASTILLO,

upon conviction of one or more of the violations alleged in this indictment, shall forfeit to the

United States:

a.      Any property, real or personal, which constitutes or is derived from

proceeds obtained, directly or indirectly, as a result of such violation and any property traceable

thereto.

b.      Any other property belonging to the defendants, up to the value of the

property subject to forfeiture, if any property subject to forfeiture:  (a) cannot be located upon

the exercise of due diligence; (b) has been transferred to, sold to, or deposited with a third

person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially

diminished in value; or (e) has been commingled with other property that cannot be subdivided

without difficulty.

43.     The property subject to forfeiture includes, but is not limited to the following: The

sum of at least **$40,272,495**, which represents the proceeds of the charged offenses, which upon

entry of an order of forfeiture shall be reduced to a monetary judgment.

(All in accordance with Title 18, United States Code, Section 981(a)(1)(C) as
incorporated by Title 28, United States Code, Section 2461(c); and Title 21, United States Code,
Section 853(p)).

20

A TRUE BILL



FOREPERSON

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

DENIS J. MCINERNEY
CHIEF, FRAUD SECTION

By: *Jessica Aber Brumberg*
Michael S. Dry
Jessica Aber Brumberg
Assistant United States Attorneys
Eastern District of Virginia

By: *for* Albert B. Stieglitz, Jr.
Trial Attorney, Fraud Section
Department of Justice

21